**Eleanor WELDE, Plaintiff,**

v.

**TETLEY, INC., Defendant.**

**No. 4:CV–91–1050.**

United States District Court, M.D. Pennsylvania.

July 25, 1994.

issue of whether the patent is obvious under section 103.

John M. Humphrey, Williamsport, PA, for plaintiff.

Michael R. Zeller, Philip I. Weis, Epstein Becker & Green, P.C., New York City, Richard M. Goldberg, Hourigan, Kluger, Spoher & Quinn, P.C., Wilkes–Barre, PA, for defendant.

### MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On August 13, 1991, plaintiff Eleanor Welde initiated this action by filing a complaint alleging sex and age discrimination by defendant Tetley, Inc. Specifically, plaintiff alleged that defendant discriminated against her by failing to pay her a salary comparable to younger, male workers who perform work requiring substantially the same skill, effort, and responsibility as plaintiff, in violation of: the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. (Count I); Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Count II); the Equal Pay Act, 29 U.S.C. § 206(d) (Count III); and the Pennsylvania Human Relations Act, 43 Pa.Stat. Ann. § 951 et seq. (Counts IV, V).

A bench trial has been held during which plaintiff withdrew all of her claims except Count III, the Equal Pay Act claim. This memorandum and the accompanying order are the final adjudication by the court.

The substance of plaintiff's claim is that, as Quality Control Supervisor at Tetley's Williamsport facility, she performs work substantially equal in terms of skill, effort and responsibility to that which was performed under similar working conditions as did Kenneth Maietta while Maietta was Quality Assurance Manager, but that plaintiff was and is paid a lesser wage than was Maietta.

## DISCUSSION:

### I. STANDARDS GOVERNING AN EQUAL PAY ACT CLAIM [1]

A party asserting a claim under the Equal Pay Act bears the threshold burden of proving that the employer pays different wages to employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). "Skill" includes an assessment of such factors as experience, training, education and ability. 29 C.F.R. § 1620.15. "Effort" refers to the physical or mental exertion needed to perform the job. 29 C.F.R. § 1620.16. "Responsibility" concerns the degree of accountability required in performing a job, with emphasis on the importance of the job obligation. 29 C.F.R. § 1620.17. These three terms—skill, effort, responsibility—"constitute separate tests, each of which must be met in order for the equal pay standard to apply." 29 C.F.R. § 1620.14(a).

If this burden is carried by the employee, it then falls to the employer to demonstrate that there is a legitimate reason for the discrepancy in pay; in the words of the statute, that the "payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex ..." 29 U.S.C. § 206(d)(1).

Should the employer make such a showing, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the reason for the disparity presented by defendant is only a pretext. *Byrnes v. Herion, Inc.,* 764 F.Supp. 1026, 1030 (W.D.Pa.1991) (citing *Chipollini v. Spencer Gifts,* 814 F.2d 893 (3d Cir.1987); *Angelo v. Bacharach Instrument Co.,* 555 F.2d 1164, 1171 (3d Cir.1977)). Although intent to discriminate is not a requisite element for making out an EPA claim, a showing of discriminatory motivation may be used to demonstrate that an affirmative defense on which the employer relies is in fact pretextual. *E.E.O.C. v. Delaware Dept. of Health and Social Services,* 865 F.2d 1408, 1414 n. 8 (3d Cir.1989).

The EPA affords relief only when males and females are paid different wages for equal work; mere comparability of positions is not sufficient to give rise to an inference that the positions under scrutiny are "equal" as that term is used in the EPA. *Angelo, supra,* 555 F.2d at 1176. "Failure to furnish equal pay for 'comparable work' or 'like jobs' is not cognizable under the Act." *Nulf v. Int'l Paper Co.,* 656 F.2d 553, 560 (10th Cir.1981). "When Congress enacted the EPA it substituted the word 'equal' for 'comparable' meaning that 'the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other.'" *Angelo, supra,* 555 F.2d at 1175 (quoting *Brennan v. City Stores,* 479 F.2d 235, 238 (5th Cir.1973)).

---

1. The parties indicated that there is no disagreement as to the standards to be applied by the court to plaintiff's Equal Pay Act claim. This section of the memorandum, then, is taken from text accompanying defendant's Proposed Findings of Fact and Conclusions of Law, with some minor editing.

■ While the Act does not require that the jobs be identical for the equal pay mandate to apply, substantial equality of job content is required. *Brobst v. Columbus Servs. Int'l,* 761 F.2d 148, 154 (3d Cir.1985) (citations omitted). "Actual job performance and content—not job titles, classifications or descriptions—is determinative." *Gunther v. County of Washington,* 623 F.2d 1303, 1309 (9th Cir.1979), *aff'd,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). *See also Angelo,* 555 F.2d at 1171.

■ "The task of determining whether plaintiff has met her burden of proving the 'equal work' component of her claim is guided by a determination of whether the jobs have a 'common core' of tasks, i.e. whether a significant portion of the two jobs is identical." *Byrnes,* 764 F.Supp. at 1030 (citing *Brobst v. Columbus Servs. Int'l,* 761 F.2d 148 (3d Cir.1985)). But if plaintiff establishes a "common core," "[t]he inquiry then turns to whether the differing or additional tasks make the work substantially different." *Brobst,* 761 F.2d at 156 (citations omitted). *See also Byrnes,* 764 F.Supp. at 1030. Therefore, even if two positions have the same or "common core" of duties and responsibilities, the two positions may still not be "substantially equal" within the meaning of the EPA and thus present an insufficient basis of comparison to support a prima facie case because of those differing or additional tasks.

With these legal standards in mind, we turn to the facts established at trial.

## II. FINDINGS OF FACT

### A. Tetley's Williamsport Facility

1. Defendant Tetley, Inc. operates a facility in Williamsport, Pennsylvania, that facility being one of a number of Tetley facilities throughout the East Coast.

2. Since 1987, Tetley's Williamsport Plant Manager has been Raymond Depp.

3. From 1971 until his promotion to Plant Manager, Depp served as the Production Manager at Tetley's Williamsport facility.

4. Depp's immediate predecessor as Plant Manager at Tetley's Williamsport facility was Alan Davies.

5. From approximately 1971 until the early 1980's, Tetley's Williamsport facility produced both tea bag products and an instant tea mix product, although the instant tea mix always was a minor part of the Williamsport operation.

6. When Tetley purchased TENCO (formerly a division of Coca–Cola) in the early 1980's, the instant tea mix operation was transferred to the former TENCO facility in Morris Plains, New Jersey.

7. Since that time, tea bag product has been the sole product of the Williamsport facility.

8. The tea bag product is a dry state product which is packaged in various forms of bags and sizes. Thirty or more components are blended and transferred to tea bag machines where the tea is placed into a manufactured bag, some containing a string and tag and others not, and then collated and machine- or hand-packed into a carton sales unit, then checkweighed, overwrapped and case-packed for shipment.

9. Prior to the mid–1980's, the Williamsport facility utilized antiquated, thirty-year-old, rebuilt machines to pack the tea in bags. The machines could pack approximately 180 bags of tea per minute.

10. These older machines did not pack the tea bags into cartons; rather, employees were utilized to hand-pack the bags into the carton sales units.

11. In the mid–1980's, IMA C–55 packing machines were installed in Williamsport and, currently, the Williamsport facility utilizes 18 IMA C–55 machines.

12. The IMA C–55 machines are state of the art and pack 450 bags of tea per minute, attach strings and tags to the bags, and collate the tea bags and machine-pack them into the carton sales units.

13. In the mid–1970's, three Delaware & Williams (D & W) machines also were installed in the Williamsport facility.

14. The D & W machines produced tea bags with mylar strips instead of string, and

different tags, and packed 350 tea bags per minute, collated the tea bags, and packed them into the carton sales units.

15. In mid–1991, two IMA C–51 machines were installed at the Williamsport facility.

16. The IMA C–51 machines pack tea into round, rather than square, bags without strings or tags, collate the bags, and pack them into carton sales units.

17. The IMA C–51 machines pack 1,600 to 2,000 tea bags per minute.

18. Since installation of the IMA C–51 machines, Williamsport's overall potential for tea bag packing is at a higher rate than previously.

19. With only the IMA C–55 and D & W machines, Williamsport's daily packing rate was optimally 7 to 7½ million tea bags per day. Currently, with all machines, 10 million tea bags per day may be reached.

20. When the IMA C–55 machines were installed in Williamsport, the facility's antiquated machines were transferred to Tetley's operation in Bristol, Pennsylvania, which had no IMA machines.

21. The Williamsport facility also co-packs tea, that is, packages tea under different brand names, as well as producing tea bags under the Tetley name.

22. In approximately 1990, Tetley began operating a facility in Marietta, Georgia, which formerly had been owned by Southern Tea.

23. The Marietta operation is a co-packing operation which produces primarily tea bags under another company's name.

24. Until 1991, a Commodities Operation also was present at Tetley's Williamsport facility charged with purchasing raw materials, ingredients and tea for the various Tetley facilities.

25. In 1991, the Commodities Operation was transferred to the Marietta facility.

26. When Depp became the Williamsport Plant Manager, Davies became the head of the Commodities Operation, and was transferred to the Marietta facility along with the Commodities Operation.

27. Tetley's Williamsport facility contains a Quality Control Department.

28. The Quality Control Department at the Williamsport facility contains the only full-functioning leaf tea quality control laboratory within the Tetley organization.

29. As so presented at trial, quality assurance at Tetley focuses on the establishment of guidelines and policy, the setting of specifications—be they for equipment, raw materials, or finished product—the creation of programs and procedures, the initiation of audit systems, all designed to satisfy corporate quality objectives.

30. The role of quality control, on the other hand, is to implement, to ascertain whether the standards and programs established by quality assurance are having the desired result. At Williamsport, the quality control function consisted predominantly of the chemical and physical testing of samples carried out in the laboratory, the weight checks of finished product (i.e., tea bag cartons) performed on the production floor, and the preparation of periodic statistical reports reflecting the results of those tests and checks.

B. *Plaintiff's Background and Employment, Generally, with Tetley*

31. Plaintiff is a female.

32. Plaintiff obtained a B.S. degree in chemistry from Western Maryland University in 1952.

33. After receiving a chemistry degree, plaintiff worked as a chemist, performing primarily quantitative analysis for three employers from 1952 until 1958, when she left the work force to start and raise a family.

34. In June, 1977, plaintiff returned to the work force as a part-time laboratory technician, or Quality Control Analyst, at the Tetley Williamsport plant, where she worked two to three days a week in the Quality Assurance Department.

35. As a part-time Quality Control Analyst, plaintiff primarily was responsible for calculating weight data, conducting quality checks of tea bags, and statistical work.

36. Plaintiff became a full-time Quality Control Analyst in November 1978.

37. Effective October 1, 1984, plaintiff was promoted to the position of Senior Quality Assurance Analyst, also known as Senior Technician.

38. As a part-time and full-time Quality Control Analyst, and as Senior Quality Assurance Analyst, plaintiff reported to Ken Maietta, Quality Assurance Manager at Tetley's Williamsport facility.

39. Maietta conducted periodic performance reviews of plaintiff between 1977 and 1986, and plaintiff received merit increases as a result.

40. During the period of time that Tetley's Williamsport plant was involved in production of instant tea mix, plaintiff did the chemical analysis required, standardized solutions, prepared experimental formulations, assayed raw materials, helped resolve various production problems, and assisted in the streamlining of the operation as volumes increased.

41. Generally, throughout the 1980's, plaintiff was in charge of the Quality Control Laboratory, and, with assistance from a part-time and then full-time Quality Control Analyst, did virtually all of the chemical and technical work required by the Quality Control Department.

42. In addition, plaintiff acted as Maietta's assistant, and, in addition to typing all of Maietta's reports, assisted him in various quality control functions such as the drafting of policies and procedures, training of personnel, interfacing with suppliers, resolving various quality control problems, and filling in for Maietta when he was away from the plant.

43. As of August 14, 1989, plaintiff was thoroughly familiar with all aspects of quality control for leaf tea bag production at the Williamsport plant and other Tetley tea packing facilities, as well as various quality control issues relating to instant tea products.

44. Effective August 14, 1989, plaintiff officially was promoted and received the title of Quality Control Supervisor at Tetley's Williamsport facility, and as such, was in charge of the Quality Control Department.

45. Concurrent with her promotion, from August 14, 1989, to August 26, 1990, plaintiff was paid a yearly salary of $26,600.00. The minimum yearly salary for her position was listed as $25,111.00, the mid-point yearly salary was listed as $31,388.00, and the maximum yearly salary was listed as $37,666.00.

46. From August 27, 1990, to August 25, 1991, plaintiff was paid a yearly salary of $28,600.00. The minimum yearly salary for her position was listed as $26,326.00, the mid-point yearly salary was listed as $32,907.00, and the maximum yearly salary was listed as $39,489.00.

47. From August 26, 1991, to September 6, 1992, plaintiff was paid a yearly salary of $30,600.00. The minimum yearly salary for her position was listed as $27,442.00, the mid-point yearly salary was listed as $34,278.00, and the maximum yearly salary was listed as $41,133.00.

48. From September 7, 1992, to September 20, 1993, plaintiff was paid a yearly salary of $32,750.00. The minimum yearly salary for her position was listed as $28,559.00, the mid-point yearly salary was listed as $35,699.00, and the maximum yearly salary was listed as $42,836.00.

49. From September 20, 1993, to date, plaintiff has been paid a yearly salary of $34,600.00. The minimum yearly salary for her position was listed as $29,694.00, the mid-point yearly salary was listed as $37,117.00, and the maximum yearly salary was listed as $44,540.00.

C. *Kenneth Maietta's Background and Employment, Generally, with Tetley*

50. Maietta is a male.

51. Maietta received a Bachelor's degree in biology in 1968.

52. Following college, in addition to working for six months computing map designs for the Department of Interior and a six-month stint in the armed services, he worked for approximately two years with two different pharmaceutical companies performing production control duties.

53. Maietta was hired by Tetley as Quality Control Supervisor at the Williamsport plant in September, 1971.

54. Maietta's title was changed to Quality Assurance Manager in May, 1973, with responsibility for quality-related functions at both the Williamsport and Savannah, Georgia, leaf (and some instant) tea facilities.

55. In April 1989, Maietta was promoted to a corporate-wide quality assurance position, and given the title of Manager of Corporate Quality Assurance.

56. From July 7, 1986, to August 2, 1987, Maietta was paid a yearly salary of $37,275.00. The minimum yearly salary for his position was listed as $27,338.00, and the maximum yearly salary for his position was listed as $41,006.00. The calculated midpoint would be $34,172.00.

57. From August 3, 1987, to September 25, 1988, Maietta was paid a yearly salary of $39,900.00. The minimum yearly salary for his position was listed as $29,042.00, and the maximum yearly salary for his position was listed as $43,562.00. The calculated midpoint would be $36,302.00.

58. From September 26, 1988, to April 2, 1989, Maietta was paid a yearly salary of $42,400.00. The minimum yearly salary for his position was listed as $30,538.00, and the maximum yearly salary for his position was listed as $45,800.00. The calculated midpoint would be $38,169.00.

59. From April 3, 1989, to April 8, 1990, Maietta was paid a yearly salary of $47,000.00. The minimum yearly salary for his position was listed as $34,656.00, the midpoint yearly salary was listed as $43,320.00, and the maximum yearly salary was listed as $51,983.00.

D. *Comparison of Reporting Relationships*

60. A job description which Maietta wrote for himself in the position of Quality Assurance Manager, Tea Products, dated July 6, 1983 shows Maietta reporting in a straight-line relationship to Dr. Dobry, Manager, Research and Development/Quality Assurance, a corporate position.

61. Maietta also had a dotted-line reporting relationship to the Plant Manager of the Williamsport facility, Allen Davies.

62. As of August 31, 1984, Maietta continued to have a dotted-line reporting relationship with Plant Manager Davies.

63. As of July 9, 1987, Maietta, in the position of Quality Assurance Manager, Tea Products, continued to have a straight-line reporting relationship to the Williamsport Plant Manager, Depp, and a dotted-line reporting relationship to Manager, Technical Services, a corporate position filled by Dr. Dobry at the time.

64. As of July 20, 1987, Maietta had a straight-line reporting relationship to the Williamsport Plant Manager, Depp.

65. During the first several months of 1986, Maietta reported directly to Dr. Dobry, and, as of approximately July 30, 1986, he began reporting directly to the Williamsport Plant Manager, Davies.

66. From approximately July 30, 1986 until his promotion to the corporate quality assurance position, Maietta had a straight-line reporting relationship to the Williamsport Plant Manager, with a dotted-line reporting relationship to Dr. Dobry, the Manager of Technical Services, a corporate quality position.

67. After his promotion to the corporate-wide quality assurance position, Maietta began reporting to Ernest Beltran.

68. As Quality Control Supervisor, plaintiff reports to the Williamsport plant manager, with a dotted line relationship to Maietta.

69. As Quality Control Supervisor, plaintiff required the approval of Depp and Maietta to make changes in quality assurance policy or procedure.

70. While Maietta reported changes in quality assurance policy or procedure, he had the authority to make such changes without prior approval.

71. Plaintiff's job description (Plaintiff's Exhibit 7) as Quality Control Supervisor lists, as her peers, the production supervisor, warehouse manager, personnel manager, plant controller, maintenance manager, and plant production engineer.

72. Maietta's last job description (Plaintiff's Exhibit 116) as Quality Assurance Manager lists as his peers the production supervisor, warehouse supervisor, personnel manager, plant comptroller and maintenance manager.

73. Concurrent with plaintiff's assignment to head the Quality Control Department at Williamsport, two production technicians who did various weight and quality checks on the production floor were assigned to the Quality Control Department under the supervision of plaintiff.

74. As Quality Control Supervisor, plaintiff has a straight-line supervisory relationship over three employees: a Quality Control Technician (Alice Belles), and the two Production Technicians.

75. As Quality Assurance Manager, Maietta had a straight-line supervisory relationship over only two employees: a Senior Quality Assurance Analyst (plaintiff); and a Quality Assurance Analyst (Belles).

76. Maietta also had quality control responsibilities for Tetley's facility in Savannah, Georgia.

77. Sue Stacey was the person in charge of the Savannah Quality Control Department.

78. During the last three full years prior to Maietta's promotion to the corporate position, 1986 through 1988, the vast majority of his duties and responsibilities involved quality control functions at the Williamsport plant, while a lesser percentage of his time was spent on other projects and the Savannah plant.

### E. *Comparison of Duties and Responsibilities*

79. After plaintiff's promotion, the duties assigned to her involved direction of more "in plant" Quality Control activities and responsibility for many functions under Quality Control that previously were considered Quality Assurance under Maietta's direction.

80. Since her promotion, plaintiff's duties as Quality Control Supervisor include, inter alia, filling in for the full-time Williamsport lab assistant by performing hands-on analysis on a sampling basis of the finished product, i.e., tea bags, and determining the frequency of string defects (i.e., whether when pulled by a product technician or lab technician, the string attached to approximately 140 sample tea bags comes off or not). Ken Maietta did not perform hands-on laboratory work or analyses for at least the last dozen years he served as supervisor of the Williamsport quality control function.

81. Plaintiff performs data work (primarily tabulating lab test results) in her office, and reviews and evaluates reports reflecting the number of recorded production defects with respect to the various tea bag filling machines on the production floor. Prior to becoming supervisor, this work was performed by Maietta.

82. Plaintiff also routinely samples packaging weights as a check on the work of the two Quality Control Technicians. To do so she works out on the production floor, weighing cartons of finished product and making related calculations (i.e., deducting for the weight of the packaging materials themselves) to determine whether the proper amount of tea is contained in the cartons. Plaintiff performs this task weekly, spending between 20 minutes to an hour per week; this work was never performed by Maietta when he was Manager of Quality Assurance. Since her promotion, plaintiff has also been responsible for filling in on the production line for these Quality Control Technicians as necessary, in addition to carrying out these weekly weight control checks.

83. Plaintiff's ongoing assignments include keeping records, monitoring all of the work being performed in the lab, working with the plant manager with respect to machines that are not functioning properly, overseeing and conducting package supply auditing to ensure that Tetley has actually received materials that it has been billed for and that the supplies meet specifications.

84. Prior to her promotion, plaintiff spent at least 70% of her time performing "bench work" in the lab. Since becoming Quality Control Supervisor, plaintiff still routinely performs bench work—although on the order of 3–5% of her day on average. However, she additionally fills in whenever the lab technician is absent or when the workload

otherwise requires more hands-on analytical work in the laboratory than the technician can comfortably perform.

85. Unlike Maietta before her, in her present position, plaintiff is not responsible for developing Quality Assurance programs for other Tetley operations, has no responsibility with respect to tea products co-packed by other companies, and does not initiate on line quality-related programs by setting policy.

86. Plaintiff's approval of changes in quality-related policies, specifications, and standards has never been required and, in any event, she has had no duties with respect to quality assurance or control matters for facilities other than Williamsport. Plaintiff's primary responsibility is to determine whether raw materials or finished goods meet pre-established quality requirements and she has not, since assuming her new position in August 1989, participated to an appreciable degree in creating or changing any specifications or establishing acceptable levels of deviation.

87. Plaintiff's sole obligation in the area of product contamination is to call a potential issue to the attention of Maietta or Depp. Even here, plaintiff's involvement is only with respect to Williamsport operations.

88. Plaintiff has conducted an inspection of outside warehouse facilities but once—and that was prior to her promotion and only because of Maietta's unavailability on that occasion; it has not been a part of her responsibilities as Quality Control Supervisor.

89. Since her promotion in August 1989, virtually all of plaintiff's time has been devoted to work specifically tied to the Williamsport facility.

90. Although Maietta visited the Morris Plains plant and met with plant and corporate level representatives on quality matters with some frequency before his promotion, plaintiff has visited the Morris Plains facility on only one occasion—in the early 1980's and in Maietta's company—in connection with a purely technical laboratory issue.

91. Welde did not, and never has, visited the Savannah facility; neither has she engaged or participated in discussions with technical people from IMA or other production line machinery manufacturers, or with Tetley corporate-level representatives with respect to the purchase of such capital equipment.

92. A document entitled "Typical Quality–Related and Support Functions," which lists certain tasks under three categories (Control, Assurance, and Research and Development) was utilized by Maietta as an outline or checklist of duties he performed.

93. Twenty-two tasks appear under the heading "Assurance." Depp testified that plaintiff performs those tasks in her current position as follows:

a. Plaintiff does special laboratory testing (color, sieve analysis, moisture, bulk density, etc.);

b. Plaintiff does chemical analysis. Neither she nor Maietta did biological analysis; rather, biological analysis was conducted by outside facilities;

c. Plaintiff does not perform off-line taste evaluations;

d. Plaintiff performs statistical analysis;

e. Plaintiff has updated standards and specifications;

f. Plaintiff updates sampling and testing procedures, and she may have established sampling and testing procedures;

g. Plaintiff has selected and updated quality control technology and equipment;

h. Plaintiff does consumer mail review and follow-up;

i. Plaintiff tests and releases co-packed products;

j. Plaintiff does reinspection and disposition of questionable products;

k. Plaintiff has recommended policies and procedures which have been approved;

l. Plaintiff has recommended report forms and communications which have been approved;

m. Plaintiff is involved in record retention;

n. Plaintiff does audit reclaim and rework;

o. Plaintiff has been involved in recall and mock recall exercises;

p. Plaintiff conducts liaison with vendors;

q. Plaintiff conducts liaison with outside services;

r. Plaintiff is involved in routine visits by weights and measures inspectors, and pest inspectors;

s. Plaintiff provides periodic summaries;

t. Plaintiff audits production and personnel, and conducts an on-line audit once or twice per year;

u. Plaintiff is involved regarding decision-making and aiding the Williamsport Warehouse Manager on trailers;

v. Plaintiff conducts quality control training of plant personnel.

94. Maietta's last job description prior to his promotion provides in part: "Initiate, audit, and direct on-line quality related programs and policies to assure that production goals and objectives are met, without deviating from established quality standards."

95. The only difference between this provision and the first item on page 2 of plaintiff's job description as Quality Control Supervisor is the deletion of the word "initiate," and addition of the phrase "established by QA" after the word "policies."

96. Plaintiff proposed programs and policies, but did not initiate programs and policies without approval by Depp or Maietta.

97. Plaintiff has drafted proposed changes to procedures which were presented to Depp and Maietta for approval and were approved.

98. The second item of Maietta's last job description reads: "Develop and maintain procedures and forms to provide production management with information necessary to keep the production operation within established control limits."

99. The only difference between this provision and the corresponding provision in plaintiff's job description is the deletion of the words "Develop and," although plaintiff has modified and initiated new procedures and forms.

100. Item 3 on Maietta's last job description reads: "Determine optimum product quality obtainable under existing operating conditions relative to desired corporate goals. To initiate actions necessary to improve actual quality by providing technical advice and assistance to production, influencing design, specification, process, and procedure changes."

101. The third item on plaintiff's job description has added to it the letters "QA" between the words "corporate" and "goals" in the first sentence, and amendment of the word "procedure" to "procedural."

102. Plaintiff performs these duties.

103. Item 4 of Maietta's last job description reads: "Act as consultant to Tetley's operations at (Bristol and TENCO) with technical assistance and guidance in establishing quality assurance programs and evaluating finished goods and packaging materials."

104. Item 4 does not appear in Plaintiff's Exhibit 7.

105. Bristol was a part of TENCO, an organization within Tetley, and as of plaintiff's promotion to Quality Control Supervisor on August 16, 1989, Bristol was no longer in operation.

106. Item 5 of Maietta's last job description reads: "Establish and audit plant and warehouse sanitation and GMP programs at Savannah and Williamsport to ensure conformance with state and federal agency regulations."

107. Item 5 does not appear in Plaintiff's Exhibit 7, but plaintiff has conducted GMP inspections under Maietta's tutelage.

108. Plaintiff provides to Depp guidance on sanitation and GMP measures and governmental quality regulations.

109. Plaintiff prepared and submitted a Sanitation and Housekeeping Manual, dated May 19, 1990, to Depp and Maietta for approval, and the Manual was approved.

110. The Manual included a checklist for a GMP inspection, beginning at page 6.

111. Item 6 of Maietta's last job description reads: "Investigate and implement programs to reduce product losses, improve raw material yield and improve on-line quality control procedures at minimum cost without unnecessary hinderance to production efficiencies and volumes."

112. The only difference between item 6 on Maietta's last job description and plaintiff's job description is that the phrase "implement programs" became "coordinate implementation of programs."

113. Plaintiff has initiated as well as coordinated implementation of programs.

114. Item 7 of Maietta's last job description reads: "Conduct in-house research projects directed toward product reformulations, raw tea chemistry, new testing procedures, verification of product claims and recipes, and competitor product audits."

115. The only difference between this item and item 7 of plaintiff's job description is the addition of the phrase "as the Manager of Quality Assurance may require" at the end.

116. Plaintiff conducts these research projects as required by the Manager of Quality Assurance, and also as required by Davies, the Vice President of Commodities.

117. Many of the projects assigned to plaintiff by Davies involve chemistry and chemical analysis, as plaintiff is a chemist.

118. Item 8 of Maietta's last job description reads: "Develop, prepare and maintain quality assurance manuals with inspection and testing methods and procedures for the various tea facilities."

119. Item 8 does not appear on Plaintiff's Exhibit 7.

120. Plaintiff has performed these duties for the Williamsport facility.

121. Davies has had plaintiff develop and implement procedures which have been provided to other Tetley facilities, including procedures to measure theaflavin and caffeine levels of leaf tea packed at Williamsport and other facilities.

122. Theaflavin is the one chemical directly related to tea taste.

123. Between 1990 and 1991 the Commodities Operation requested plaintiff to develop procedures that have been performed on tea for other facilities.

124. Item 9 of Maietta's last job description reads: "Act as liaison between vendors in establishing performance capabilities to aid Purchasing in selection and development of material sources."

125. The only difference between this provision and item 9 of plaintiff's job description is the addition of the phrase "and Production" after the word "Purchasing."

126. Plaintiff performs these duties.

127. As the head of the Williamsport Quality Control Department, the major purpose of the plaintiff's position is to direct programs which improve product quality, increase tea yields, and reduce packaging losses.

128. In carrying out this purpose, from August, 1989 through the present, plaintiff has engaged in the following activities which represent most, but not all, of her duties:

(a) Manages the Quality Control Department in all of its functions, the activities of the Quality Control Technicians on the production floor, the analytical and support services of the Quality Control Laboratory, and provides detailed reports to the Plant Manager on quality control issues.

(b) Directs established on-line quality programs, and audits, interprets and reports quality and weight levels.

(c) Improves existing quality programs for the purpose of improving product quality, machine performance and efficiency, and increased yields by providing technical assistance to production.

(d) Develops quality programs for new product lines, determines machine capabilities, and trains personnel with respect to quality functions.

(e) Recruits and trains salaried non-technical Tetley employees to function as temporary QC techs when necessary, and is responsible for scheduling the QC tech positions.

(f) Directs in-house research projects in tea chemistry, foreign contaminants, decaffeination processes, and other analytical work.

(g) Initiates and implements programs to maintain caffeine levels at .4% or less in decaf blends of tea for all Tetley Tea facilities.

(h) Provides technical advice and consults with vendors of packaging supplies in order to secure the best materials.

(i) Prepares and maintains quality manuals with procedures for department-wide inspection, testing, and reporting.

129. The Williamsport Quality Control Department has accountability for the quality of 8 million net pounds of tea bag product annually, with a finished product valued at over $16 million (using 1989 figures).

130. Shortly after assuming her new position in charge of the Quality Control Department, plaintiff initiated a program to improve the weight control procedures at the Williamsport plant. It was recognized that by reducing "overfill," i.e., the amount of product containing more tea than specified, many pounds of tea, and therefore dollars, could be saved.

131. Under plaintiff's direction, projects were initiated and carried out to determine individual machine weight fluctuations in order to determine optimum adjustments, and additional attention was paid to packaging material weights. Previously unavailable and more current data was generated by the computer and program written under plaintiff's direction. The use of the computer and program permitted quicker and more accurate corrections.

132. It was determined that this new weight control program saved 36,287 pounds of tea, at a dollar value of $40,374.00, at the Williamsport plant in 1990, with similar savings annually thereafter.

133. As a result of this work, in 1991, plaintiff received the President's Award for Excellence, an annual award given to selected employees for outstanding contributions to the company.

134. As Quality Control Supervisor, plaintiff also does special projects as requested by Davies in his corporate-level commodities position, such as theaflavin, caffeine, and other chemical analyses which have corporate-wide use and effect, as well as other special projects concerning filter problems, density evaluations, dust evaluations, and establishing standards on maximum and minimum tea density.

135. Plaintiff performs approximately two to three special projects per year at the direction of Davies.

136. Plaintiff has filled in for Depp as Acting Plant Manager in charge of the Williamsport facility when Depp has been unavailable.

137. Because the Williamsport facility has the only analytical laboratory, plaintiff also performs and supervises performance of analyses upon request from other plants.

138. Plaintiff also developed procedures to maintain the proper decaffeination level for Tetley's decaffeinated tea product, and is responsible for the decaffeination level of all Tetley decaffeinated tea.

139. In 1990, plaintiff spent a considerable amount of time, possibly as much as 10% of her time, working on water extractable and turbidity analyses for tea which Davies was buying for Tetley's Morris Plains (formerly TENCO) facility.

140. Plaintiff has purchased and designed equipment for use in her special projects and other work, such as a new checkweigher.

141. At the request of Depp, plaintiff updated the Sanitation Manual and designed new forms.

142. As of the date plaintiff became Quality Control Supervisor, there was no organized laboratory manual or Quality Control manual with all of the procedures in it; therefore, plaintiff organized, revised and rewrote the laboratory and Quality Control manuals.

143. Plaintiff also wrote a training manual for the IMA machines.

144. Savannah, like Williamsport, blends and packages leaf tea under both the Tetley and other labels.

145. The services Maietta provided for Savannah duplicated those he provided for Williamsport.

146. Depp could pre-empt Maietta's Savannah duties.

147. Stacey received extensive training at Williamsport for her Quality Control position at Savannah; that training was provided primarily by plaintiff and Alice Belles, the other Quality Control employee in Williamsport.

148. Plaintiff and Belles trained Stacey in all procedures, packaging specifications, and computations on underfill and overfill.

149. Maietta explained to Stacey during this training period that she would be responsible for conducting GMP inspections at Savannah, and he showed her how to conduct a GMP inspection with the assistance of plaintiff.

150. Maietta provided no other technical training to Stacey, and no hands-on training; however, Maietta was responsible for ensuring that Stacey was trained.

151. Stacey had responsibility for establishing and designing the Quality Assurance laboratory at Savannah, though general guidance was provided by Maietta.

152. A preliminary drawing provided to Stacey by Maietta consisted of a single sheet of paper, hand drawn, basically showing locations for a table, a sink, and the like, with no design of where equipment should be placed. Stacey revamped the diagram to make it functional.

153. The procedures and forms provided to Stacey by Maietta, plaintiff and Belles for use in Savannah were in fact procedures and forms for Williamsport, which were also pertinent to Savannah because the two facilities were doing the same thing.

154. Stacey had to modify on her own a number of the forms provided to her, because Savannah also produced family-size tea bags.

155. Stacey did not obtain approval from Maietta or her Plant Manager when she revised procedures and forms.

156. Stacey spoke with Maietta on the telephone approximately two to three times per month from May, 1988, until the date of his promotion. None of the telephone conversations was longer than 15 minutes, and most were not that long.

157. Stacey prepared a manual and procedures by herself for the Savannah IMA C–51 machines with no direct input from Maietta.

158. Stacey also testified that prior to Maietta's promotion, she also spoke with plaintiff or Belles two to three times or more per month regarding procedures and other technical issues.

159. Prior to Stacey's employment at Savannah, there were no written Quality Control procedures and policies in place at Savannah, and the GMP manual had been written by the Savannah Plant Manager.

160. Maietta's responsibilities regarding TENCO/Morris Plains instant tea mix may have extended into 1987 but, if they did, they were not at the frequency they had been previously.

161. Sam DiBenedetto is the Quality Control Manager of the Morris Plains facility, and, as such, is the highest ranked Quality Control employee at the Morris Plains facility.

162. Prior to 1989, DiBenedetto reported to the Corporate Director of Quality Assurance for TENCO (which owned the Morris Plains facility prior to Tetley), Angelo Giamarino.

163. DiBenedetto has reported to the Morris Plains Plant Manager since 1989.

164. DiBenedetto did not receive any technical assistance from Maietta from 1986 through mid–1989.

165. DiBenedetto did not receive any direction from Maietta in developing testing procedures or methods.

166. Maietta was involved in some new product research and development issues for Morris Plains between 1986 and 1989, and Maietta visited the Morris Plains plant on several occasions on these issues.

167. DiBenedetto did not ask Maietta to do work for him or provide him with advice.

168. Maietta developed target specifications for defect levels in the mid–1970's.

169. Maietta did not change any specifications from 1986 through the date of his promotion.

170. Maietta's expense reports from 1986 through the date of his promotion in 1989, Plaintiff's Exhibit 127, reflect that he made two trips in 1986 for a total of four days; six trips in 1987 for a total of fifteen days; three trips in 1988 for a total of six days; and one trip in 1989 prior to his promotion for a total of two days. This amounts to a total of twenty-seven days from 1986 through the date of his promotion, for an average of nine days per year.

171. Plaintiff has performed functions which Maietta was never called upon to perform or was not qualified to perform. In particular, plaintiff supervises one additional Quality Control employee; is responsible for additional training and scheduling of salaried personnel to fill in for the Quality Control Technicians; has utilized quality checks of the Quality Control Technicians which were never utilized by Maietta; is proficient in chemistry and has developed and carried out various chemical analyses for all of the Tetley tea facilities; and has done extensive work for the Morris Plains plant in connection with water extractable analysis, as well as performing special projects at the request of Davies regarding theaflavin, caffeine, and other chemical analyses. She also consults regularly with quality personnel at other facilities, particularly Savannah, concerning quality control issues.

172. Starting in the 1970's, Maietta was also charged with ensuring that outside contractors performing "co-packing" functions for Tetley were doing so to Tetley quality standards; these responsibilities included approving from a quality standpoint the initial use of any particular co-packer, conducting periodic on-site inspections, and acting as Tetley's intermediary on quality-related issues as they arose with these co-packers. The standards Tetley's co-packers were expected to meet in such areas as good manufacturing practices ("GMP"), sanitation, and finished product specifications were established in the first instance by Maietta.

173. Later, when Tetley purchased other leaf tea filling and packing operations in Chicago, Illinois, and Bristol, Pennsylvania, in or about 1982, Maietta established their quality assurance programs, inspected the facilities, and interviewed candidates for quality-related positions at these locations. Although Maietta did not have direct chain-of-command supervision of the quality related functions at these plants, he was available to serve as a technical consultant to their on-site quality assurance personnel throughout the time these plants were operated by Tetley.

174. Permanent changes in quality specifications and procedures at Tetley's Williamsport and Savannah tea facilities, both before and since Maietta's promotion in 1989, require the approval of both Maietta and the plant manager. The same is true for any temporary relaxation of, or deviation from, such quality-related standards.

175. As Manager of Quality Assurance, Maietta historically approved the use of independently owned warehouses in the Williamsport vicinity utilized by Tetley for storing packaging materials and finished goods, thereafter carrying out periodic GMP and sanitation inspections of these warehouses. Since at least 1985, Maietta had also performed a similar function with respect to warehouses utilized by the Savannah facility. The Savannah facility ceased operations in the fall of 1993, four years subsequent to plaintiff's promotion; right up to that closure, Maietta continued to exercise these duties for that plant. He still retains these responsibilities for the Williamsport operation.

176. In 1986 or 1987, before he became Manager of Corporate Quality Assurance, Maietta traveled to Germany for several days and, along with Alan Davies, head of Commodities for Tetley, participated in negotiations with PlantExtrakt, a primary supplier of decaffeinated tea to Tetley.

177. In 1985 or 1986, when Tetley was determining whether to purchase state-of-the-art tea bag filling and packaging machinery from an equipment manufacturer (IMA) located in Bologna, Italy, Maietta was re-

sponsible for assessing the equipment's capabilities from a quality assurance viewpoint. Maietta set the quality standards for this equipment after observing how the prototype machine operated in the Savannah Tetley installation.

178. In 1986, Maietta participated in confidential discussions concerning the possible construction of a decaffeinated tea plant in the vicinity of Williamsport.

179. When an analytical laboratory was established for the first time in Savannah in the spring of 1988, Maietta, in conjunction with Plant Manager Fred Griffin, interviewed and hired Susan Stacey as Savannah's first on-site quality control analyst.

180. Both before and since his promotion in 1989, Maietta has borne and exercised responsibilities concerning a variety of other quality assurance matters beyond the scope of quality control at the Williamsport facility, including control over the disposition of "obsolete" tea products, acting as liaison with the United States Food and Drug Administration, state and local health agencies and United States Customs authorities whenever issues arise with respect to the integrity of raw leaf tea entering the country, or finished product leaving Tetley's tea facilities; providing to and receiving guidance and direction from Tetley's Corporate legal and Commodities groups with respect to matters of possible product contamination; and the addressing and resolution of other quality assurance issues of corporate-wide impact, ranging from the improvement of vendor compliance with Tetley packaging material specifications, to the proper use of hair restraints on the production line, to the creation of a program to evaluate competitive products, to the reclamation of raw tea otherwise "lost" in the filling and packing process.

F. *Tetley's Use of the HAY System*

181. Edward Schuler was employed by Tetley from February 1983 to early 1993 as Manager of Compensation and thereafter as Manager of Compensation and Staffing.

182. The HAY system has been used by Tetley at all times relevant to this case as a systemized method of determining salary ranges for salaried employment positions within the company.

183. The main tools in applying the HAY System are three charts, entitled "Know–How," "Problem Solving," and "Accountability" under which different points are assigned for different levels of "Know–How," "Problem Solving," and "Accountability."

184. Schuler utilized the HAY System in calculating the salary range for Plaintiff as Quality Control Supervisor.

185. The HAY System is utilized to calculate a pay range for a position, not for the individual in the position.

186. An individual's actual salary within the salary range then is set based upon factors including years of experience.

187. In applying the HAY System, the "Know–How" slot is the most important, not only because it carries the most points, but also because the "Problem Solving" and "Accountability" slots and, therefore, points, are dependent upon the "Know–How" slot.

188. The "Know–How" slot is described by letters or numbers such as "EI3", with the "E" representing the technical depth of a particular position.

189. The Plaintiff's "Know–How" slot was determined by Schuler to be "DI3", indicating that the technical depth of her position was a "D."

190. Referring to the "Know–How" chart, the "D" characterization is as follows:

D. ADVANCED VOCATIONAL

Some specialized (generally non-scientific) skill(s), however acquired, giving additional breadth or depth to a generally single functional element.

191. On the other hand, the "E" characterization for technical depth provides as follows:

E. BASIC TECHNICAL–SPECIALIZED

Sufficiency in a technique which requires a grasp either of involved practices and precedents; or of scientific theory and principles; or both.

192. The definitions and characterization of positions under the HAY System are sub-

jective, rather than objective, based upon how the individual utilizing the HAY System personally interprets "Know–How," "Problem Solving," and "Accountability."

193. The general terms and designations given to a particular position in the HAY system vary due to the fact that all of the positions in a corporation must be placed somewhere along the scale, so that an employee who might otherwise be termed "Basic Technical–Specialized" may be placed at "C" on the scale if there are a number of higher-ranking officers within the corporation.

194. According to Schuler, the ranking or ordering of the positions is more important than the designation given, because: (1) the system is designed to cover a wide range of positions and arrange them on a pay scale; and (2) the designations are meant as a guideline and are not meant to bind the person making the designations.

195. Schuler had input into selecting plaintiff's title of Quality Control Supervisor.

196. Schuler's understanding was that quality control personnel follow through and implement tests to comply with policies and procedures established by quality assurance personnel, and that quality assurance personnel establish policies and procedures.

197. Schuler's understanding was that the plaintiff does not develop or initiate procedures.

198. When discussing the differences between Maietta's last job description before his promotion and plaintiff's current job description, Schuler testified that the first two items on page 2 of those job descriptions are the most important.

199. Schuler was not informed that plaintiff would be assuming any of the duties considered quality assurance under Maietta's prior position.

### III.  CONCLUSIONS OF LAW

1. This court has jurisdiction over plaintiff's claim under the Equal Pay Act of 1963, 29 U.S.C. § 206(d) pursuant to 28 U.S.C. § 1331.

2. Venue in this district is proper, since both plaintiff and defendant are residents of the Middle District of Pennsylvania for purposes of venue.  28 U.S.C. § 1391.

3. Plaintiff has satisfied all statutory prerequisites for bringing this action.

4. Plaintiff, as Quality Control Supervisor, did not perform work of substantially equal skill, effort and responsibility and under similar working conditions as did Maietta while Maietta was Quality Assurance Manager.

5. Tetley is an employer within the meaning of 29 U.S.C. § 206(d) and is engaged in commerce within the meaning of 29 U.S.C. § 206(a).

6. To establish a violation of the EPA, plaintiff must prove that defendant has discriminated on the "basis of sex" in wage rates paid to employees performing equal work within the meaning of the statute.  An employer violates the EPA by paying unequal wages for "equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions."

7. Maietta's position prior to his own promotion was not the substantial equal of that into which plaintiff was promoted in August of 1989; it was significantly more complex in the skills and mental effort, and in the accountability it entailed.

8. Even were these positions "substantially equal" within the meaning of the statute, the challenged salary differential is "based on any other factor other than sex."

9. Plaintiff failed to prove that she performed substantially equal work on jobs that required equal skill, effort and responsibility within the meaning of 29 U.S.C. § 206(d). Tetley has also demonstrated that the differential in salary and salary range between plaintiff and Maietta are the products of a compensation system based on factors other than sex.

### IV.  PLAINTIFF'S INITIAL BURDEN

As discussed above, a plaintiff asserting a claim under the EPA bears the initial burden of demonstrating a discrepancy in

pay for work that is substantially equal in terms of skill, effort and responsibility. Plaintiff failed to meet this burden, particularly in the area of responsibility.

Initially, we note that Maietta, when he occupied the position of Quality Assurance Manager at the Williamsport facility, also was responsible for quality-related functions at the Savannah facility. This fact, in and of itself, shows a greater level of responsibility on the part of Maietta, since plaintiff is responsible for the Williamsport facility alone. Maietta's responsibility for the Savannah plant also substantiates the contention made by defendant that Maietta had wider-scale, "corporate" responsibilities while Quality Assurance Manager at Williamsport.

Maietta also testified regarding a number of other roles he played, such as the inspector of outside (non-Tetley) warehouse facilities, contact person for regulatory agencies and other companies, etc. In two occurrences, Maietta participated in negotiations with a foreign corporation and in confidential negotiations concerning the construction of a new Tetley plant in the vicinity of Williamsport. In each instance, plaintiff sought to downplay the significance of Maietta's contribution, and indeed his contributions were often not of major consequence. However, the overall impact of his activities demonstrates a higher level of responsibility than plaintiff, who had no role in these dealings, or simply filled in for Maietta when he was not available (as when she once inspected an outside warehouse).

In closing arguments, counsel for both parties spoke at length concerning the relative credibility of plaintiff and Maietta. Were we considering the testimony of these two persons in isolation, there is little doubt that plaintiff made the better, more credible witness. She was forthright and direct in her answers, while Maietta was overly deliberative, often evasive, in providing answers to even the simplest questions. However, Maietta's testimony was corroborated by the testimony of other witnesses and documentary evidence sufficiently to lead the court to conclude that there was a significantly higher level of responsibility on his part than that

assumed by plaintiff when she was promoted to her current position.

There also was significant dispute as to the percentage of time which Maietta spent on tasks related solely to the Williamsport facility as opposed to his "corporate" and Savannah-related tasks, ranging from 75% on Williamsport to 95–98% on Williamsport. A close approximation of the percentage of time is of little consequence, since carrying responsibility does not appear on a time clock. Even if Maietta spent 99.99% of his time on Williamsport-related activities, the fact that he carried larger-scale responsibilities would make his job different, and more valuable, than a person who did not bear those responsibilities but performed nearly identical tasks.

Plaintiff also argued extensively that the court should consider only the last few years that Maietta occupied the position of Quality Assurance Manager at Williamsport, i.e. after 1985, since his work load in those years was focused even more on that facility alone. However, there was no evidence that Maietta's job had changed in that time. More specifically and more importantly, there was no evidence that Maietta's responsibilities had changed. The fact that Maietta may not have been required by circumstances to take any particular action to carry out those responsibilities does not indicate that the responsibilities were relinquished.

Indicative of this difference in responsibilities is the level of expectation placed on Maietta and plaintiff. Plaintiff testified concerning her receipt of the President's Award for Excellence for her work in reducing weight control fluctuations, thereby saving Tetley a large amount of money. The giving of an award, well-deserved though it was, indicates that this work was above and beyond that which was expected of plaintiff, not that the work was part of her expected performance.

We therefore conclude that, while a majority of the tasks performed by Maietta and plaintiff are the same, there is a significant difference in the level of responsibility borne by Maietta when he was the Quality Assurance Manager and the level of responsibility borne by plaintiff in her position as Quality

Control Manager. The positions therefore are not substantially equal in terms of skill, effort and responsibility, the latter reflecting the significant difference.

### V. DEFENDANT'S BURDEN

■ Even if we were to conclude that plaintiff had met her burden of demonstrating a discrepancy in pay for substantially equal work, defendant met its burden of showing that the pay differential was based on a factor other than sex. Edward Schuler testified concerning Tetley's use of the HAY System, a method of establishing corporate salaries based upon the relative importance of positions.

In order to determine where, within the HAY System, to place plaintiff's position, Schuler was given a job description. That plaintiff is female was not considered by Schuler, since he evaluates the position, and the person occupying the position is not material to his determination.

Using the job description prepared for the position to which plaintiff was promoted, which excluded Maietta's "initiation"-type functions as well as his corporate responsibilities, Schuler determined plaintiff's salary range, and determined her salary within that range. *See* Findings of Fact Nos. 45–49.

Plaintiff's attacks on defendant's application of the HAY System will be discussed in the next section of this memorandum. For purposes of the instant discussion, however, it is clear that defendant met its burden. The HAY System was used to determine plaintiff's salary, as demonstrated by Schuler's uncontradicted testimony. The HAY System evaluates a position without regard to the person filling the position, and so clearly is gender-neutral. Defendant therefore met its burden of showing that any differential in pay was attributable to a factor other than sex.

### VI. PLAINTIFF'S SECOND BURDEN

■ Defendant having met its burden, plaintiff then has the burden of demonstrating that the proffered reason for the discrepancy in pay is only a pretext. Plaintiff also did not meet this burden.

Plaintiff attacked defendant's use of the HAY System in two ways: first, by showing that her position did not fit the descriptions provided by the grids used in assigning points to a position within the System; and second, by contending that the job description used by Schuler was not accurate.

With regard to the first contention, plaintiff attempted to show that Schuler misapplied the HAY System because the ratings used did not match her position. For example, on the "Know–How" chart, page 1 of Defendant's Exhibit 27, Schuler rated plaintiff's position as "DI3," with the "D" indicating "Advanced Vocational." This denomination is following by the description: "Some specialized (generally non-scientific) skill(s), however acquired, giving additional breadth or depth to a generally single functional element." On cross-examination of Schuler, counsel for plaintiff asked whether a rating of "E" might not have been more appropriate, especially as the description following "E" seemed more on point with plaintiff's position.

Schuler indicated, however, that the descriptions are meant to be a general guideline, and that the more important consideration is that of placing the positions requiring most technical proficiency at the higher end of the scale. The same applies to the various other scales used in the HAY System.

As to the second contention made by plaintiff, the job description appears to match what was expected of plaintiff when she was promoted. The job was changed from a Quality Assurance to a Quality Control position, meaning that plaintiff was expected to apply established standards and procedures, with less emphasis placed upon initiating new procedures, setting new standards, etc. A job description is by nature somewhat vague, with some room for flexibility and practical adaptation. Any variance between the job description and the work performed by plaintiff, either more or less than was expected, appears to fit comfortably into this flexible area.

Based upon the foregoing, then, plaintiff did not meet her burden of demonstrating that defendant's use and application of the

HAY System was only a pretext, and no claim under the EPA was established.

## VII. CONCLUSION

Plaintiff bore an initial burden of showing a discrepancy in pay for substantially equal work. The work performed by Maietta while Quality Assurance Manager at Williamsport varied significantly from the work performed by plaintiff because of a substantial difference in levels of responsibility. Defendant also showed a gender-neutral basis for a pay discrepancy in the form of the HAY System. Finally, plaintiff failed to establish that defendant's use and/or application of the HAY System was a pretext.

For these reasons, judgment will be entered in favor of defendant and against plaintiff. An appropriate order shall issue.

## ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Plaintiff having withdrawn at trial all claims save her Equal Pay Act claim, Counts I, II, and IV of the complaint are dismissed.

2. The court finds in favor of defendant on Count III of the complaint.

3. The clerk is directed to enter final judgment in favor of defendant and against plaintiff, and to close the file.